UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| NORTH CENTRAL COMPANIES, INC., | Case No. 16-CV-3816 (PJS/HB) |
| Plaintiff, | |
| | ORDER |
| v. | |
| MINERVA DAIRY, INC., | |
| Defendant. | |

Scott R. Carlson, SRCARLSON LAW LLC, for plaintiff.

Barbara P. Berens, Erin K. F. Lisle, and Carrie L. Zochert, BERENS & MILLER, P.A., for defendant.

Plaintiff North Central Companies, Inc. ("North Central") buys large quantities of cheese from various suppliers—including defendant Minerva Dairy, Inc. ("Minerva")—and resells that cheese to its customers.  In May 2016, North Central issued four purchase orders for cheese to Minerva, and Minerva confirmed the orders in writing.  Ultimately, however, Minerva failed to fulfill three of the four orders, leaving North Central scrambling to find alternative suppliers of cheese that it had already promised to its customers.  North Central was mostly successful in finding replacement cheese, but North Central had to pay more for the replacement cheese than it would have had to pay for the cheese ordered from Minerva.  Peeved, North Central refused to

pay Minerva for the cheese that Minerva had delivered pursuant to the one fulfilled purchase order.

Minerva sued North Central in an Ohio state court, seeking payment for the cheese that it had delivered. Minerva argued that the purchase orders issued by North Central were offers, that Minerva's confirmations of the purchase orders were acceptances, and thus that the parties had entered into four binding contracts for the sale of cheese. Minerva further argued that it had performed under one of the contracts by delivering cheese, but North Central had breached its obligation to pay for that cheese. The Ohio court agreed with Minerva, ruling that North Central and Minerva "did enter into a contract for the production and sale of cheese products" and that North Central "is in breach of the contract." Carlson Aff. 2, ECF No. 46, Ex. 23 at 2.

In this action, North Central has sued Minerva for breach of contract for failing to deliver the cheese promised in connection with the three unfulfilled purchase orders. In response, Minerva argues—in direct conflict with the arguments that it successfully made in the Ohio litigation—that the purchase orders issued by North Central were not offers, that Minerva's confirmations of the purchase orders were not acceptances, and thus that the parties did not enter into binding contracts for the sale of cheese.

North Central now moves for summary judgment. The Court finds that, under the doctrine of judicial estoppel, Minerva cannot now deny that it entered into four

binding contracts with North Central for the sale of cheese. The Court further holds that Minerva breached three of those contracts by failing to deliver cheese as promised. The issue of damages will have to be tried, however.

## I. BACKGROUND

### A. The Transactions

Minerva sells cheese in two ways. Mueller Aff., ECF No. 30, ¶¶ 2-3. First, Minerva and a purchaser can enter into an ongoing commitments contract, under which Minerva promises to sell, and the purchaser agrees to buy, particular quantities of cheese over a particular period of time at a particular price. *Id.* ¶ 2. Commitments contracts assure Minerva that it will have buyers for its cheese and assure purchasers that they will have access to a supply of cheese. Second, Minerva sells cheese through "spot orders"—essentially one-time transactions at market prices. A buyer who wants to make a single purchase of a discrete amount of cheese at the market price will contact Minerva—and, if Minerva has surplus cheese available, Minerva will accept the spot order. *Id.* ¶ 3.

North Central and Minerva never entered into a commitments contract. Rather, over a period of several years, North Central would from time to time place spot orders for cheese with Minerva, and Minerva would fulfill those orders. Consistent with that course of dealing, North Central emailed Adam Mueller (Minerva's president) on

May 18, 2016, seeking to purchase various quantities of white cheddar cheese for delivery in May and June.  Rogers Aff., ECF No. 27, Ex. 1.  Within the hour, Mueller responded:  "We will be making it as fast as we can!  Thank you for the order."  *Id.* North Central sent Minerva two purchase orders—numbered 122260 ("P.O. 260") and 122261 ("P.O. 261")—to formalize the transactions.  *Id.* Exs. 2-3.

Later that month, on May 27, 2016, North Central sent Minerva two additional purchase orders—numbered 122264 ("P.O. 264") and 122265 ("P.O. 265")—for white cheddar cheese for delivery in late June or early July.  *Id.* Ex. 4.  On June 4, 2016, after North Central requested confirmation of the four purchase orders, Minerva sent North Central written confirmations.  *Id.* Exs. 5-8, 10; Mueller Aff. ¶¶ 6, 9, 12-13; *id.* Ex. 2. Later that week, in response to North Central's request for a status report, Mueller advised North Central that the cheese was being produced:  "We are making cheese as fast as we can, sorry for the delays."  Rogers Aff. Ex. 12.  Relying on the order confirmations, North Central entered into contracts to resell the cheese to its customers. Sheveland Aff., ECF No. 26; Mueller Aff. Exs. 3-4.

In late June, Minerva began communicating that it might not be able to fill North Central's orders because of milk shortages.  *See, e.g.*, Mueller Aff. Exs. 3-4.  Later, however, Minerva seemed to suggest that the reason it would not deliver the cheese was because the market price had soared since the purchase orders were accepted in

early June.  *See* Rogers Aff. Ex. 13 at 3 ("P.O.'s were accepted with the extremely low

price due to the availability of milk.").  Minerva also indicated that it would deliver the

cheese if North Central would enter into a commitments contract at above-market

prices.  *See* Mueller Aff. Exs. 6-7 ("Can we set up an annual commitment . . . at +.18 over

the market?  I can arrange to have the milk and be able to commit to this.").

Not surprisingly, North Central was angered by Minerva's tactics, and soon the

parties were arguing about what, if any, contractual obligations existed between them.

North Central insisted that contracts had been formed and that "[i]t is the responsibility

of the manufacturer to determine if there will be sufficient supply of raw materials to

make the finished product that was ordered and confirmed."  Mueller Aff. Ex. 9; *see also*

Rogers Aff. Ex. 13.  Minerva, by contrast, maintained that no contracts existed:  "[Our

employee] sent you a confirmation that we received your order.  That doesn't mean it

will be filled, we do not have a contract[.] . . . You prefer to purchase your product on

the surplus market for the discounted rates instead of contracted annually.  That is the

risk that you assumed[.]"  Mueller Aff. Ex. 9.

Minerva eventually delivered some cheese to North Central, but only enough to

fill P.O. 260.  *See* Rogers Aff. ¶ 5.  In order to satisfy its obligations to its customers,

North Central scrambled to purchase as much cheese as it could from other

suppliers—cheese that it bought at a higher price than it would have paid Minerva.

Sheveland Aff. ¶¶ 2-3 & Ex. 14.  Despite its best efforts, however, North Central could

not quite satisfy all of its outstanding obligations.  *See* ECF No. 20 at 6.  Angry over the

losses and other problems caused by Minerva's failure to fulfill the purchase orders,

North Central refused to pay Minerva for the cheese that had been delivered to satisfy

P.O. 260.

*B. The Ohio Action*

Litigation ensued.  Minerva sued North Central in an Ohio state court to recoup

payment for the cheese that it delivered to satisfy P.O. 260.  *See* Carlson Aff. 2 Ex. 20.

North Central then sued Minerva in a Minnesota state court (the case was later removed

to this Court) to recover damages that it suffered on account of Minerva's failure to

satisfy P.O. 261, P.O. 264, and P.O. 265.  *See* ECF No. 1.

In Ohio, Minerva asserted two causes of action.  Carlson Aff. 2 Ex. 20.  The first

cause of action was labeled "Complaint on Account"—a type of breach-of-contract

claim under Ohio law.  The second cause of action was for unjust enrichment.  After

North Central answered the complaint, the parties engaged in limited discovery.  *See,*

*e.g.*, *id.* Exs. 21-22.  Minerva then moved for summary judgment.  *Id.* Ex. 22.

The memorandum that Minerva submitted in support of its motion contained a

section entitled "Law and Argument," which was comprised of two subsections.  In the

first subsection, Minerva argued that it was entitled to a judgment against North

Central.  Minerva's argument—in its entirety—was as follows:[1]

### a.  North Central's breach of contract

The formation of a contract requires an offer, acceptance of the offer, and consideration.  *Complete General Construction Co. v. Kard Welding, Inc.*, 182 Ohio App.3d 119, 2009-Ohio-1861, ¶ 17 (10th Dist.).  The issuance and submission[] of a purchase order is viewed as an offer which may be accepted or rejected by the recipient.  *American Bronze Corp. v. Streamway Products*, 8 Ohio App.3d 223, 227 (8th Dist. 1982).

In the instant matter, North Central issued and submitted four purchase orders to Minerva.  These purchase orders constituted offers to Minerva.  In response, Minerva issued a number of order confirmations; effectively accepting [North Central's] offers and forming contractual obligations between the two parties.  The consideration to support said contractual obligations consisted of Minerva's goods and services of production, and North Central's payment for the same.

Minerva produced and shipped cheese sufficient to satisfy North Central's purchase order No. 122260.  The cheese product was received and accepted by North Central and Minerva subsequently invoiced North Central for the same.  Nonetheless, North Central has refused to tender payment to Minerva for the products.  See *Affidavit of Adam Mueller*.

---

[1]To enhance readability, the Court has replaced the word "Plaintiff" with "Minerva" and the word "Defendant" with "North Central" whenever it has quoted from Minerva's brief.

> North Central's refusal to pay Minerva for the products it produced constitutes a breach of contract; a breach for which Minerva is entitled to judgment against North Central for the sums due and owing to Minerva for the cheese produced.

*Id.* Ex. 22 at 4-5.

In the second subsection (entitled "Setoff defense unavailable to North Central"), Minerva argued that its recovery against North Central should not be set off by any amount that Minerva might owe North Central with respect to the three unfulfilled purchase orders that were the subject of the Minnesota litigation. *Id.* Ex. 22 at 5-7. Minerva distinguished between (1) the defense of setoff, which, it argued, is available only when the defendant claims that it is owed money by the plaintiff in connection with "a transaction other than the one giving rise to Plaintiff's claim," and (2) the defense of recoupment, which, it argued, is available when the defendant claims that it is owed money by the plaintiff in connection with "the same transaction as a plaintiff's claim." *Id.* Ex. 22 at 6.

Minerva noted that North Central had pleaded the defense of setoff in its answer. But, said Minerva, that defense did not apply:

> The facts giving rise to Minerva's claims in Ohio, and North Central's claims in Minnesota, arise from the same transaction and continuous occurrence. . . . By raising the defense of setoff, however, North Central asserts that the matters are wholly independent of one another, arising from separate unrelated events. This is simply not the case. . . .

> . . . Because Minerva's and North Central's claims arise from the same transaction, North Central's offset defense is inapplicable here. . . .

*Id.* Ex. 22 at 6-7. North Central did not file a memorandum in opposition to Minerva's motion for summary judgment.

In a brief order, the Ohio court agreed with Minerva that Minerva had entered into a contract with North Central, that Minerva had performed its obligation under that contract to deliver cheese, and that North Central had breached its obligation under that contract to pay for that cheese. Specifically, the Ohio Court said:

> Upon review of [Minerva's] Motion for Summary Judgment, supporting evidence and documentation, the Court finds the Motion well-taken. This Court finds that [Minerva] and [North Central] did enter into a contract for the production and sale of cheese products, which [Minerva] did produce and deliver the cheese products to [North Central], and that [North Central] has failed to pay for the same. As a result, [North Central] is in breach of the contract."

*Id.* Ex. 23 at 2. The Court awarded Minerva "the sums due it for [North Central's] breach of contract[.]" *Id.* Ex. 23 at 3.

### C. This Action

As noted, North Central brought this action against Minerva, seeking to recover damages that it suffered on account of Minerva's failure to satisfy P.O. 261, P.O. 264, and P.O. 265. North Central now moves for summary judgment. ECF No. 19.

Consistent with Minerva's arguments in the Ohio litigation (which, again, North Central did not contest) and the holding of the Ohio court, North Cental argues that the parties entered into four binding contracts for the delivery of cheese. One of those contracts—the contract formed when Minerva accepted P.O. 260—was honored by Minerva when it delivered the cheese. But three of those contracts—the contracts formed when Minerva accepted P.O. 261, P.O. 264, and P.O. 265—were breached by Minerva. Thus, says North Central, just as North Central had to pay Minerva the damages that Minerva incurred as a result of North Central's breach of the first contract, Minerva must now pay North Central the damages that North Central incurred as a result of Minerva's breach of the second, third, and fourth contracts.

It is hard to disagree with North Central's argument, which relies on the venerable principle that what is good for the goose is good for the gander. But Minerva does disagree with North Central's argument. Specifically, Minerva now contends that the purchase orders issued by North Central were not offers, that Minerva's confirmations of the purchase orders were not acceptances, and thus that the parties did not enter into *any* binding contracts for the sale of cheese. *See* ECF No. 31 at 4 ("The purpose of this [Order Confirmation] form is *not* to enter into a binding contract with the party who has requested a spot order.") (emphasis original); *id.* at 16 n. 9 ("Minerva does not concede there was a contract between the parties[.]"); *see also* Carlson Aff. 1,

ECF No. 40, Ex. 17 at 2 ("Minerva maintains that no binding contract was ever formed between North Central . . . and Minerva[.]"); *id.* Ex. 19 at 2 ("There is no binding contract between Minerva Dairy and North Central Companies, Inc. regarding the manufacture of cheese.").

The arguments that Minerva now makes before this Court appear to directly contradict the arguments that Minerva made before the Ohio court. For that reason, the Court asked the parties to brief the question of whether the Court should invoke the doctrine of judicial estoppel to preclude Minerva from denying that it entered into binding contracts with North Central. ECF No. 42.

## II. ANALYSIS

### A. Standard of Review

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* at 255.

*B. Liability*

Judicial estoppel is an equitable doctrine that "is intended to protect the courts from being manipulated by chameleonic litigants who seek to prevail, twice, on opposite theories." *State v. Pendleton*, 706 N.W.2d 500, 507 (Minn. 2005) (quoting *Levinson v. United States*, 969 F.2d 260, 264 (7th Cir. 1992)).[2] The Minnesota Supreme Court has not formally adopted (or rejected) the doctrine, but the Minnesota Court of Appeals has applied it.[3] The parties do not dispute—and this Court predicts—that the Minnesota Supreme Court will adopt the doctrine when presented with a case in which all of the elements of the doctrine are met.

Although it has not yet formally adopted the doctrine, the Minnesota Supreme Court has described three conditions that must be met before judicial estoppel can be applied:

> First, the party presenting the allegedly inconsistent theories must have prevailed in its original position (a litigant is not forever bound to a losing position). Second, there must be a clear inconsistency between the original and subsequent position of the party. Finally, there must not be any distinct or different issues of fact in the proceedings.

---

[2]A district court is "bound to apply state law elements of judicial estoppel in a diversity case." *Occidental Fire & Cas. Co. v. Soczynski*, 765 F.3d 931, 935 n.3 (8th Cir. 2014). Accordingly, this Court applies Minnesota law.

[3]*See Bauer v. Blackduck Ambulance Ass'n, Inc.*, 614 N.W.2d 747 (Minn. Ct. App. 2000); *Port Auth. of City of St. Paul v. Harstad*, 531 N.W.2d 496 (Minn. Ct. App. 1995).

*Pendleton*, 706 N.W.2d at 507) (cleaned up).

Each of the three factors is met in this case:

First, there is a clear inconsistency between the position that Minerva presented before the Ohio court and the position that Minerva is presenting before this Court. Before the Ohio court, Minerva took the position that (1) North Central's purchase orders were offers; (2) Minerva's confirmations of those orders were acceptances; and thus (3) North Central and Minerva were bound by four contracts, under which Minerva was obligated to deliver, and North Central was obligated to pay for, the specified types and quantities of cheese. Carlson Aff. 2 Ex. 22.

Second, Minerva prevailed in its original position. The Ohio court found that Minerva's position was "well-taken" and held "that [Minerva] and [North Central] did enter into a contract for the production and sale of cheese products" and that "[North Central] is in breach of the contract." *Id.* Ex. 23 at 2. In other words, the Ohio court ordered North Central to pay damages to Minerva because it found that North Central breached a contract that Minerva now says never existed.

Finally, there are no material factual differences between the proceedings. The four purchase orders and the written confirmations of those orders were issued in connection with what Minerva itself has described as "the same transaction and continuous occurrence." *Id.* Ex. 22 at 6. Because (to quote Minerva) "Minerva's and

North Central's claims arise from the same transaction," the two proceedings present the same issues of fact. *Id.* Ex. 22 at 7.

In short, this appears to be a textbook case for application of the doctrine of judicial estoppel. When confronted with that fact at oral argument, counsel for Minerva did not deny that Minerva was taking a position before this Court that directly contradicted the position that Minerva took in front of the Ohio court. Instead, Minerva's Minnesota counsel said that she thought that Minerva's Ohio counsel was "wrong" to argue that valid contracts existed between Minerva and North Central.

In its supplemental brief, however, Minerva now argues that "the positions taken by Minerva in the two actions are not clearly inconsistent . . . but are instead substantially the same." ECF No. 47 at 1. Engaging in some revisionist history, Minerva contends that it did not even *make* a claim for breach of contract in the Ohio litigation, but instead sought only a *non*-contractual recovery on a quantum meruit or similar theory. In support of this argument, Minerva makes several points—all clearly meritless.

First, Minerva argues that its "Ohio Complaint did not assert a contract claim" but instead made claims for "complaint on account" and unjust enrichment. *Id.* at 1; *see also id.* at 4 ("Minerva's Ohio Complaint did not assert **a contract claim and never mentioned an offer, an acceptance, or the existence of any contract between Minerva**

**and North Central.**") (emphasis original).  Minerva never really explains the nature of a "complaint on account," if it is not a claim for breach of contract.  But Minerva implies that it regards a "complaint on account" as similar to a claim for quantum meruit—that is, a claim brought by someone who has provided goods or services on account but who is not a party to a legally enforceable contract.

Minerva is incorrect.  As the Ohio courts have repeatedly explained, "[a]n action on an account is 'founded upon contract' *and constitutes a breach of contract claim*."  *Gray Printing Co. v. Blushing Brides, L.L.C.*, 2006-Ohio-1656, 2006 WL 832587, ¶ 21 (quoting *Oxford Sys. Integration, Inc. v. Smith–Boughan Mechanical Servs.*, 159 Ohio App.3d 533, 2005-Ohio-210, 824 N.E.2d 586, ¶ 16) (emphasis added); *see also Johncol, Inc. v. Cardinal Concession Servs., L.L.C.*, 2017-Ohio-9031, 101 N.E3d 1014, ¶ 16 (same); *Benchmark Contrs., Inc. v. Southgate Mgt., L.L.C.*, 2014-Ohio-1254, 2014 WL 1347740, ¶ 38 (same).  A "complaint on account" is simply a pleading device—sanctioned by Rule 10(D)(1) of the Ohio Rules of Civil Procedure—whose purpose is "'to avoid the multiplicity of suits necessary if each transaction between the parties (or item on the account) would be construed as constituting a separate cause of action.'"  *Citibank (S. Dakota) N.A. v. Lesnick*, 2006-Ohio-1448, 2006 WL 763078, ¶ 8 (quoting *Am. Sec. Serv., Inc. v. Baumann*, 32 Ohio App. 2d 237, 242, 289 N.E.2d 373, 377 (Ohio Ct. App. 1972)); *see also Johncol*, 2017-Ohio-9031, ¶16 (same).

Even if Minerva was correct that its "complaint on account" was not a breach-of-contract claim, it would not matter, as judicial estoppel applies not just to the formal claims and defenses made by a party in its pleadings, but to the arguments that the party made before a court. *See, e.g.*, *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("[J]udicial estoppel, 'generally prevents a party from prevailing in one phase of a case on an *argument* and then relying on a *contradictory argument* to prevail in another phase.'") (emphases added); *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1047 (8th Cir. 2006) ("[A] party that takes a *certain position* in a legal proceeding, 'and succeeds in maintaining that position,' is prohibited from thereafter assuming a *contrary position* 'simply because his interests have changed[.]'") (emphases added); *Pendleton*, 706 N.W.2d at 508 ("[T]he doctrine is aimed at preventing bad faith abuses of the judicial system wherein a party asserts *one theory* to prevail at one time, then cynically switches to an *inconsistent theory* to win in a subsequent proceeding.") (emphases added).

Second, proceeding from the erroneous premise that its claim for "complaint on account" was not a claim for breach of contract, Minerva then cherry picks sentences out of the summary-judgment brief filed in the Ohio court to try to support its contention that it never argued that it had a contract with North Central. Instead, Minerva insists, it merely argued that it delivered cheese to North Central, that North Central accepted the cheese, and that North Central thus had to pay for the cheese. ECF

No. 47 at 8 (. . . "Minerva did not rely on the argument that the purchase orders and confirmation forms were 'contractual obligations.'  Rather, Minerva focused principally on its production and shipment of cheese, its invoicing for the cheese, and North Central's acceptance of but refusal to pay for the cheese.") (citation omitted).

This is not a fair characterization of Minerva's brief.  The entirety of Minerva's argument for why North Central should be held liable is reproduced above.  The heading of that argument was "North Central's breach of contract."  Carlson Aff. 2 Ex. 22 at 4.  The first sentence of that argument was "[t]he formation of a contract requires an offer, acceptance of the offer, and consideration."  *Id.*  Minerva then explicitly argued that North Central's "purchase orders constituted offers to Minerva" and that Minerva had "effectively accept[ed] North Central's offers" when "Minerva issued a number of order confirmations."  *Id.* at 5.  And Minerva explicitly contended that, when it accepted North Central's offers, Minerva "form[ed] contractual obligations between the two parties." *Id.*[4]

_____

[4]Minerva now makes much of the following sentence in its Ohio brief:  "The consideration to support said contractual obligations consisted of Minerva's goods and services of production, and North Central's payment for the same."  Carlson Aff. 2 Ex. 22 at 5.  Minerva suggests that what was meant by that sentence is that the contract was not supported by consideration until the cheese was delivered.  Thus, Minerva suggests, it is not taking a contrary position in this litigation because "[a]s a result of the absence in this case of the 'consideration,' as that was defined by Minerva in the Ohio Action, well established contract law dictates that there is no enforceable contract here

(continued...)

It is true, of course, that Minerva pointed out in its brief that it had delivered the

cheese to North Central and that North Central had refused to pay for it.  But this was

merely to show that Minerva had *performed under the contract* (and that North Central

had not), not that Minerva *did not have a contract*.  The brief itself makes this clear:

"North Central's refusal to pay Minerva for the products it produced constitutes *a*

*breach of contract*; a breach for which Minerva is entitled to judgment against North

Central for the sums due and owing to Minerva for the cheese produced."  *Id.*

(emphasis added).  Minerva did not in any way argue that it was entitled to recover

under a non-contract-based theory, such as quantum meruit or unjust enrichment.

Third, Minerva argues, in essence, that if its Ohio attorney had intended to argue

breach of contract, he would have done a better job of it.  Minerva points out, for

example, that the attorney did not introduce into evidence the purchase orders that

_____

[4](...continued)
(and thus the two positions are easily reconcilable)."  ECF No. 47 at 6.

This argument borders on frivolous.  Obviously, Minerva was not arguing to the Ohio court that no consideration existed for the contract until the parties performed their obligations under the contract—that is, until Minerva delivered the "goods" and North Central made "payment for the same."  That would mean that one party could never sue another party for failure to perform under a contract, because an enforceable contract could not exist without consideration, and consideration could not exist without performance.  Obviously, Minerva was merely pointing out that the consideration for the contracts was Minerva's *commitments* to deliver cheese and North Central's *commitments* to pay for the cheese.  That is why Minerva was able to sue North Central for breach of contract *before* North Central paid for the cheese.

were the supposed offers or the confirmations that were the supposed acceptances. ECF No. 47 at 6 ("[T]he purchase orders and the confirmation forms were never offered as part of Minerva's record in support of summary judgment[.]").  Minerva also points out that the affidavit that the attorney submitted (signed by Mueller) did not explicitly claim that Minerva and North Central had entered into contracts.  *Id.* at 6-7, 11-12.

Of course, the best way to determine what the Ohio attorney argued is to look at what the Ohio attorney argued.  As the Court has discussed at length, the Ohio attorney brought a breach-of-contract claim in his complaint, moved for summary judgment on that breach-of-contract claim, and argued in support of his motion that North Central's issuance of the purchase orders and Minerva's confirmation of those orders created legally binding contracts.  It is true that the Ohio attorney could have submitted additional evidence in support of his argument.  But this was a routine state-court collection action (with undisputed facts) involving a three-page complaint, a three-page answer, a one-page summary-judgment motion, a five-page memorandum in support of the motion, and a two-page order granting the motion.  Clearly, all involved were trying to handle the case as quickly and inexpensively as possible.

More importantly, it is not true (as Minerva implies) that the Ohio attorney had to submit the purchase orders and confirmations in order to establish a breach of contract.  Ohio law is clear that "the plaintiff [need not] introduce any documentary

proof into evidence to prove breach of contract; the plaintiff may establish a prima facie case through oral testimony." *AMF, Inc. v. Mravec*, 2 Ohio App. 3d 29, 31, 440 N.E.2d 600, 603 (1981).) Minerva's attorney did submit an affidavit from Mueller, and that affidavit attested both that North Central "did issue to [Minerva] four purchase agreements" and that "[u]pon receipt of the purchase orders, [Minerva] issued order confirmations for the same." Carlson Aff. 2 Ex. 22 at 13. The Ohio court could find—and obviously did find—that Mueller's affidavit was sufficient to establish that the parties "did enter into a contract." *Id.* Ex. 23 at 2.

Finally, Minerva claims that "North Central paid for the shipped cheese even before the Ohio Court issued its Order" on May 24, 2017. ECF No. 47 at 3. In support of its assertion, Minerva submits a North Central check in the amount of $155,737.43 made payable to Minerva and dated May 18, 2017. ECF No. 48-3. But Minerva does not submit any evidence as to the date on which North Central actually mailed that check. Moreover, Minerva's assertion that the check was mailed before the judgment was entered is contradicted by the sworn testimony of its own president, who attested in an affidavit that "*[a]fter* judgment was entered in th[e] action against North Central it finally paid for the cheese." Meuller Aff. ¶ 22 (emphasis added).

Putting that aside, Minerva's assertion is irrelevant. Minerva's argument that it had entered into contracts with North Central was accepted by a judge who entered a

binding judgment—a judgment that has not been vacated and that imposes a legal obligation on North Central to pay not just $155,737.43 for the cheese, but also "interest at the statutory rate" and "court costs incurred herein."  Carlson Aff. 2 Ex. 23 at 3.  Minerva does not explain why such a judgment is insufficient to support the application of the doctrine of judicial estoppel, nor does Minerva cite any legal authority that would support such an argument.

*   *   *

For these reasons, Minerva is judicially estopped from arguing that it did not enter into contracts to provide North Central with enough cheese to fill P.O. 261, P.O. 264, and P.O. 265.  Minerva does not dispute that *if* it entered into such contracts, it breached those contracts by failing to provide the promised cheese.  The Court therefore grants North Central's motion for summary judgment in part and finds as a matter of law that Minerva is liable to North Central for breach of contract.

### C. Damages

Minerva also argues that the Court should deny North Central's motion for summary judgment because "there are material fact disputes about whether North Central acted reasonably and in good faith when purporting to seek cover."  ECF No. 31 at 20.  But Minerva's argument is largely premised on its assertion that Minerva had no contractual obligation to deliver cheese to North Central.  The Court has already held to

the contrary.  Consequently, the Court finds that North Central acted reasonably in relying on Minerva's promise to perform—and that, after Minerva breached, North Central had the right to contract with other suppliers to cover its losses.

Nonetheless, there appears to be a material factual dispute with respect to damages.  In its opening brief, North Central asserted that it covered 40,000 pounds of the cheese described in P.O. 265 with a purchase from Nasonville.  That transaction, it averred, resulted in a loss of approximately $81,077.94.  *See* ECF No. 20 at 6.  Minerva points out, however, that there is reason to question whether North Central is entitled to damages for that specific transaction:  North Central purchased (more expensive) *kosher* cheese from Nasonville, but P.O. 265 was for (less expensive) *non-kosher* cheese.

Alone, that fact would be noteworthy.  But there is more.  Prior to Minerva's failure to deliver, North Central contracted to sell 40,000 more pounds of kosher cheese than it had ordered from Minerva.  *See* ECF No. 31 at 19 & n.11; *see also* ECF No. 33, Ex. 1.  It is possible, then, that North Central's purchase from Nasonville was not an attempt to cover Minerva's breach, but instead an attempt to "cover" an error made by North Central.

Because North Central has not responded to Minerva's assertions, *see* ECF No. 39 at 8, the Court is not in a position to resolve the issue of damages.  The Court asks that

the parties confer and attempt to resolve the issue themselves.  If they are unable to do so, the parties will have to try the issue before a jury.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT plaintiff 's motion for summary judgment [ECF No. 19] is GRANTED IN PART and DENIED IN PART as follows:

1.  Plaintiff's motion is GRANTED insofar as it seeks a ruling that defendant is liable to it for breach of contract.

2.  Plaintiff's motion is DENIED WITHOUT PREJUDICE insofar as it seeks a ruling regarding the amount of damages owed by defendant.

Dated:  August 31, 2018                              s/Patrick J. Schiltz
                                                    Patrick J. Schiltz
                                                    United States District Judge